UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ELISABETH S. BROCKIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| VS. | ) | |
| | ) | 3:06-CV-0185-G |
| AMERIPATH, INC., | ) | |
| | ) | **ECF** |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court are the motions of the defendant Ameripath, Inc.

("Ameripath" or "the defendant") for summary judgment and to strike the affidavit of

Virginia Petty.  For the reasons set forth below, the defendant's motion to strike is

denied, but the defendant's motion for summary judgment is granted.

## I.  BACKGROUND

This case arises from Ameripath's termination of the plaintiff's employment.

Ameripath operates pathology laboratories at various locations, including Trinity

Medical Center ("Trinity") and Richardson Regional Medical Center ("Richardson").

The plaintiff, Dr. Elisabeth Brockie ("Brockie" or "the plaintiff"), was formerly

employed by Ameripath as a pathologist.  Brockie contends that she was discharged

because of gender discrimination in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*

Ameripath hired Brockie in 1998 through a written employment agreement.

Employment Agreement at 63, *attached to* Defendant's Appendix to its Motion for

Summary Judgment ("Defendant's Appendix") *as* Exhibit C.  The employment

agreement provided for two types of termination of the employment relationship:

(1) termination for cause and (2) termination without cause.  See *id.* at 67-69.  The

termination for cause provision encompassed a narrow set of instances in which it

would be applicable.  See *id.*  Under the "without cause" provision, Ameripath

retained the "sole and absolute discretion" to terminate Brockie's employment.  *Id.* at

69.

Initially, Brockie was employed by Ameripath at its Trinity lab.  Plaintiff's

Brief in Opposition to Defendant's Brief in Support of Its Motion for Summary

Judgment ("Plaintiff's Brief") at 2.  Clients of Ameripath, physicians working at

Trinity, would remove tissue samples from their patients and submit those samples to

Ameripath for review.  Defendant Ameripath, Inc.'s Brief in Support of Its Motion for

Summary Judgment ("Defendant's Brief") at 1-2.  As a pathologist, Brockie's role was

to examine these samples and report her findings.  *Id.*  Brockie reported directly to

Dr. Tom James ("James"), Trinity's Medical Director, who in turn reported to Dr.

Steve Aldred ("Aldred").  Plaintiff's Brief at 2-3.  While employed at the Trinity lab, Brockie worked a part-time schedule.  See *id.* at 3.  Because she only worked three days per week, Ameripath had another pathologist, Dr. Cinda Stoddard ("Stoddard"), who worked on Brockie's off days.  Declaration of Cinda Stoddard, M.D. ("Stoddard Declaration") ¶ 2, *attached to* Defendant's Appendix *as* Exhibit F.

In September 2004, Ameripath transferred Brockie to Richardson, where she continued to work a three-day per week schedule.[1]  Plaintiff's Brief at 4.  Dr. Steven Hebert ("Hebert"), another pathologist, served as the medical director for the Ameripath lab at Richardson.  *Id.*  At Richardson, Ameripath served, among others, three client-physicians:  Dr. Elizabeth Jekot ("Jekot"), Dr. Terre McGlothin ("McGlothin"), and Dr. Steven Gadol ("Gadol").  Jekot and McGlothin specialize in breast cancer treatment; Gadol specializes in gastrointestinal medicine.  *See* Deposition of Dr. Steve Hebert ("Hebert Deposition") at 20, Oct. 7, 2006, *attached to* Defendant's Appendix *as* Exhibit A.  It is undisputed that while Brockie was at

---

[1]       Brockie contends that her transfer from Trinity to Richardson was due to Dr. Steve Hebert's need to manage his own workload as medical director at Richardson and her unwillingness to work full-time at Trinity.  See Deposition of Dr. Stephen Aldred at 13, Nov. 7, 2006, *attached to* Plaintiff's Appendix *as* Exhibit A. Ameripath contends that Brockie's transfer was due in part to a conversation between Stoddard and Aldred regarding Brockie's performance.  *See* Stoddard Declaration ¶¶ 7-8.  Though the reason for her transfer is in dispute, it is not a material fact.

Richardson, discussions regarding Brockie's performance took place between Hebert and these physicians.[2]

On March 4, 2005,  Hebert sent an email to Ameripath's corporate headquarters regarding an incident involving one of Gadol's patients; in the email, Hebert stated that the incident was an example of a "disturbing trend with Dr. Brockie's performance" and that he was "considering termination before this case appeared."  Email from Dr. Steven Herbert to Juliet Ciaravino, March 4, 2005, *attached to* Affidavit of Steven Hebert ("Hebert Affidavit") *as* Exhibit 1, *attached to* Defendant's Appendix *as* Exhibit H.  On March 8, 2005, Hebert emailed Steve Fuller ("Fuller"), who works in Ameripath's corporate human resources department, that Hebert would like to begin separation proceedings between Ameripath and Brockie. *See* Email from Steve Hebert to Steve Fuller, March 8, 2005, *attached to* Hebert Affidavit *as* Exhibit 1.  Two days later, on March 10, 2005, Hebert informed Brockie that he was placing her on administrative leave pending an investigation into certain performance related complaints raised by other physicians.  *See* Deposition of Elisabeth Schultz Brockie ("Brockie Deposition") at 116, Nov. 9, 2006, *attached to* Appendix in Support of Plaintiff's Brief in Opposition to Defendant's Brief in Support of Its Motion for Summary Judgment ("Plaintiff's Appendix") *as* Exhibit H. In a letter dated March 14, 2005, Ameripath gave Brockie written notice of its

---

[2]       The substance of these conversations is disputed and will be addressed *infra*.

- 4 -

decision to terminate her employment under the "without cause" provision of her employment agreement. *See* Letter from Steve Hebert to Elisabeth S. Brockie, March 14, 2005, *attached to* Plaintiff's Appendix *as* Exhibit P.

Brockie's belief that her termination was based on gender discrimination stems largely from one uncontested statement by Hebert. At some unspecified point during Brockie's employment, Hebert allegedly stated in a private conversation with Virginia Petty ("Petty"), a regional human resources employee, that Brockie "had the reputation of being a 'streetwalker' and that the story at Ameripath was that Dr. Brockie had financed her education by being a 'streetwalker.'" Declaration of Virginia L. Petty ("Petty Declaration") ¶ 2, *attached to* Plaintiff's Appendix *as* Exhibit I. Petty further stated that Hebert made this comment "in a joking manner." *Id.*

In his deposition testimony, Hebert stated that he made the decision to terminate Brockie's employment because he had lost his confidence in her abilities as a pathologist and due to certain unprofessional behavior. *See* Hebert Deposition at 8. Hebert named several instances that led to his losing confidence in Brockie and also gave several examples of what he considered unprofessional conduct on her part. While Brockie largely contests Hebert's testimony regarding the instances that resulted in his losing confidence in her and challenges some of his testimony regarding her unprofessional conduct, the following instances of unprofessional conduct cited by Hebert remain uncontested: (1) Brockie made comments to other

employees using vulgar language in reference to the sexual relationship between her and her boyfriend, *see* Declaration of Toni Storey ("Storey Declaration") ¶ 5 (stating that Brockie, while relaying a story about testimony given by her boyfriend during the course of Brockie's divorce proceedings, said that her boyfriend "made a comment about 'fucking her on the couch.'"), *attached to* Defendant's Appendix *as* Exhibit G; Hebert Deposition 45-46; (2) Brockie received many phone calls regarding her divorce proceedings while at work and on one occasion was yelling into the phone loud enough that employees of the sleep lab housed next to the pathology lab called to complain about the noise, *see* Storey Declaration ¶ 4; Hebert Deposition at 47-48; and (3) Brockie made excessive use of the pathology lab's copy machine, fax machine, and phone for personal use, *see* Hebert Deposition 48-49.

As stated above, some of the facts that Hebert claims led to his loss of confidence in Brockie are in dispute.  The sections below highlight the areas of dispute and clarify what evidence before the court is undisputed.

### A.   Brockie's Performance at Trinity

Ameripath argues that Brockie's performance at Trinity was less than stellar and offers the testimony of Brockie's co-worker, Stoddard, as evidence thereof. Brockie points to her performance reviews to contest that factual assertion.  While it is undisputed that Brockie always received a performance rating of "outstanding" while at Trinity, the defendant contends that James allowed Brockie to complete her

own performance appraisals.  *See* Brockie Deposition at 82-85, *attached to* Defendant's Appendix to its Motion for Summary Judgment *as* Exhibit E.  The plaintiff argues that her performance was so satisfactory that Aldred and James offered her the medical director position at Trinity, which Brockie turned down because she wanted to maintain a part-time schedule.  *See* Affidavit of Elizabeth S. Brockie ¶ 3, *attached to* Plaintiff's Appendix *as* Exhibit J.

Though Brockie's actual performance is in dispute, it is uncontested that in March 2005, Stoddard, Brockie's co-worker at Trinity, conveyed to Hebert an assessment of Brockie's performance.  Stoddard Declaration ¶ 8.  According to her declaration, Stoddard told Hebert:  (1) that Brockie ordered deeper tissue samples to avoid working on the  more difficult cases;[3] (2) that Stoddard had to re-work some of Brockie's reports because doctors would call to complain that the reports were incomplete; and (3) that Stoddard discussed Brockie's performance with Aldred and threatened to leave Ameripath if Brockie's performance did not improve.  *Id.* ¶¶ 4, 6-7.

Thus, while Brockie's actual performance at Trinity is contested, the fact that Stoddard shared her assessment with Hebert in March 2005 is undisputed.

---

[3]       Due to Brockie's part-time schedule and the time it took to produce the deeper cuts, Brockie's requests caused Stoddard to handle the more difficult cases on the days when Stoddard was in the office.  Stoddard Declaration ¶ 4.  Stoddard felt that Brockie's requests were excessive.  *Id.*

B.  Gadol's Opinion of Brockie's Performance

Ameripath cites the criticism of Gadol as an additional reason leading to

Brockie's termination.  In his deposition testimony, Gadol recalled two instances in

which he had problems with Brockie's performance.  *See generally* Deposition of Dr.

Steven Gadol ("Gadol Deposition") at 40-46, Dec. 21, 2006, *attached to* Plaintiff's

Appendix *as* Exhibit D.  The first incident involved Brockie's diagnosis of a certain

patient as having microscopic colitis.  *Id.* at 40.  According to Gadol, a diagnosis of

microscopic colitis requires findings based on "a specific set of pathological criteria."

*Id.*  Gadol stated that he felt Brockie's initial report did not contain the necessary

information to support the diagnosis.  *Id.*  After approaching Brockie regarding the

diagnosis and expressing his concerns, Brockie stood by her initial diagnosis.  *Id.*

Because he was not satisfied with the outcome of his discussion with Brockie, Gadol

took his concerns to Hebert and asked Hebert to review the specimen.  *Id.* at 41.

Hebert reviewed the specimen and ultimately agreed with Gadol, *viz.*, that the

diagnosis of microscopic colitis was not warranted.  *Id.*  In response to Gadol's

testimony regarding this incident, Brockie only points to the fact that Gadol

recognized it was her prerogative not to change her original diagnosis.  Plaintiff's Brief

at 12-13 (*citing* Gadol Deposition at 41).

The second performance related problem recalled by Gadol involved a case in

which he performed an colonoscopy on a patient during which he took a tissue

sample of a large lesion on the patient's rectum.  *Id*. at 42.  Gadol sent several samples

to the pathology lab where Brockie reviewed them.  *Id.* at 43.  Her report to Gadol

regarding the samples contained a diagnosis of "rectal adenoma carcinoma," and the

diagnosis constituted the entirety of her diagnostic report.  *Id.*  Gadol stated that he

was "disappointed in the lack of detail on the report" and that it was "extremely

disappointing" not to have received a phone call from Brockie because "it is the

standard of pathologists to call the surgeon or endoscopist when there is a diagnosis

of cancer."  *Id.*  After expressing his concern regarding the content of the original

report to either Hebert or Brockie, an amended report was forwarded to Gadol with

additional information but making the same diagnosis of cancer.  See *id.* at 44.  At

that time, Gadol referred the patient to Dr. Anuradha Thummala ("Thummala").  *Id.*

at 45.  The patient ended up having her rectum surgically removed.  *Id.*  Following

the surgery, Gadol received a phone call from Thummala in which she informed him

that the entire rectum had been examined following removal and no cancer was

found.  *Id.*  Gadol then discovered that two weeks after the first amended report, a

second amended report had been issued by Brockie in which the diagnosis was

downgraded to precancerous adenoma; however, Brockie did not contact Gadol

personally to inform him of the change in diagnosis.  *Id.*

    At the conclusion of the incident, Gadol contacted Hebert to express his

concern regarding this case.  According to Gadol, he expressed that he was "upset"

about the lack of communication and the change in diagnosis.  *Id.* at 46.  Gadol "mentioned to [Hebert] that [he] had reservations about [Brockie] dealing with any more of [his] pathological specimens" and requested that Brockie no longer work on the samples from his patients.  *Id.*  He described the incident as being "the most egregious incident involving a pathologist that [he has] had in 12 years of practice in Richardson."  *Id.* at 49.

Brockie's response to this incident is that the surgery *may* have been necessary regardless of the diagnosis, and Brockie claims that she informed the surgeon who performed the removal about the change in diagnosis prior to the surgery.[4]  *See* Plaintiff's Brief at 13-14.

Thus, it is uncontested both that Gadol complained to Hebert on two separate occasions in which Gadol believed Brockie misdiagnosed his patients and that he requested that Brockie no longer review samples from his patients.

---

[4]     As evidence that the patient would have needed surgery regardless of whether the polyp was cancerous, Brockie cites only her own deposition in which she stated that she spoke with the surgeon who performed the operation and that the surgeon informed Brockie the surgery was necessary.  Plaintiff's Brief at 14 (*citing* Brockie Deposition at 120).  However, Brockie's recollection of what the surgeon said is inadmissible hearsay.  *See* FED. R. EVID. 801, 802.  Though presented with this specific challenge to Brockie's testimony, *see* Defendant Ameripath, Inc.'s Reply to Plaintiff's Response to Ameripath, Inc.'s Motion for Summary Judgment at 5, she failed to offer any argument regarding the admissibility of this testimony.  *See generally* Plaintiff's Sur-Reply in Response to Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment.

C.  Jekot's Opinion of Brockie's Performance

It is uncontested that in 2005, following the incident with Gadol's rectal cancer patient, Jekot had a conversation with Hebert regarding Brockie's performance.  Ameripath contends that three specific points were made in that conversation:  (1) that when posed with a numerical scale, Jekot ranked Brockie's performance at the lowest end of that scale; (2) that Jekot told Hebert it would be "morally wrong" to continue Brockie's employment; and (3) that Jekot requested Hebert to prohibit Brockie from reviewing Jekot's patients' samples.  Defendant's Brief at 4; Defendant Ameripath, Inc.'s Reply to Plaintiff's Response to Ameripath, Inc.'s Motion for Summary Judgment at 6-8.  The latter point is disputed by Brockie; she avers that such request was never made by Jekot.  *See* Plaintiff's Brief at 16.  Jekot's testimony corroborates Brockie's averment.  *See* Deposition of Elizabeth Jekot, M.D. ("Jekot Deposition") at 84, Dec. 19, 2006, *attached to* Plaintiff's Appendix *as* Exhibit F.

As to the other two points from the conversation between Jekot and Hebert, Brockie does not dispute that those statements were made.  In her deposition, Jekot stated that she would rate Brockie as being in the lower third of those pathologists with whom Jekot had worked with over the years.  *Id.* at 83 ("A.  . . . I would probably put her in the lower third.  Q.  Your confidences in her diagnostic abilities?  A. The lower third.  Q.  And her helpfulness to you?  A.  The lower third.").  Brockie's

response to this statement is that Jekot further testified that even though Brockie was in the lower third of pathologists at Richardson, Brockie's performance was still "average or fine." *Id.* Additionally, Jekot testified that she told Hebert it would be "morally wrong" to allow Brockie to continue analyzing samples. *Id.* at 84. Again, Brockie does not dispute that this statement was made, but rather attacks the basis for Jekot's statement. In her deposition, Jekot stated that both her rating of Brockie's performance and her statement that it would be "morally wrong" to continue allowing Brockie to practice were based, at least in part, on statements made by Hebert to Jekot. *Id.* at 83-84.

While there is a dispute as to how Jekot arrived at her opinion of Brockie, it is undisputed that Jekot conveyed to Hebert her opinion that Brockie's performance was on the lower end of pathologists with whom Jekot had worked and told Hebert that it would be morally wrong to allow Brockie to continue examining slides.

### D.  McGlothin's Opinion of Brockie's Performance

The defendant also contends that McGlothin conveyed to Hebert concerns she had regarding Brockie's performance. *See* Defendant's Brief at 5. According to the defendant, McGlothin complained of three problems with Brockie's performance: (1) on a particularly unusual case, Brockie failed to call McGlothin with an unexpected pathological finding; (2) Brockie misdiagnosed a sample of breast tissue by erroneously finding that there was no cancer in the tissue; and (3) Brockie did not

- 12 -

call McGlothin with the results for all of McGlothin's patients in direct contradiction to McGlothin's request. *Id.* at 5-6. Brockie contests Ameripath's assertion that McGlothin requested to be called with the findings on all of her patients, and McGlothin's deposition testimony confirms the lack of such a request. *See* Deposition of Dr. Terre McGlothin ("McGlothin Deposition") at 92-93, Jan. 5, 2007, *attached to* Plaintiff's Appendix *as* Exhibit G.

While the third point asserted by the defendant is in contention, Brockie does not challenge Ameripath's first two points. On one occasion Brockie correctly read a tissue sample finding no cancer when McGlothin was expecting a finding of cancer. See *id.* at 92. While McGlothin does not question Brockie's diagnostic skills in this case, McGlothin noted that she felt as though Brockie should have personally contacted her regarding the unanticipated finding. See *id.* ("I remember something to the effect of suggesting that the pathologist should have at least called and brought this to my attention, that that was worthy of discussing."). Second, McGlothin recalled one instance in which Brockie concluded that a patient did not have cancer and two days later Hebert reexamined the sample and made the correct finding that cancer was present in the tissue. See *id.* at 93-94. Following this incident, McGlothin contacted Hebert "expressing [her] general displeasure about having two different diagnoses within forty-eight hours." *Id.* at 94.

Thus, it is uncontested that McGlothin complained to Hebert once about not receiving a call to inform her of a diagnosis and that McGlothin complained to Hebert of a misdiagnosis committed by Brockie.

## II.  ANALYSIS

### A.  Motion to Strike

Following the plaintiff's response to the defendant's motion for summary judgment, Ameripath moved to strike the affidavit of Virginia Petty.  As grounds for the motion to strike, Ameripath argues that the plaintiff has made misrepresentations to this court and that the information included in the declaration is "mostly hearsay and half-truth's."  Defendant Ameripath, Inc.'s Rule 56(g) Motion to Strike Affidavit and Brief in Support at 6.

To the extent that the nonmovant bears the burden of demonstrating a genuine issue of material fact, she need not present evidence meeting the admissibility requirements for trial.  See *Celotex Corporation v. Catrett*, 477 U.S. 317 (1986).  Rather, the nonmovant may rely on any form of evidence listed in Rule 56(c).  See *id.* (noting the nonmovant does not need to depose her own witness to defeat a motion for summary judgment).  While the form of the nonmovant's evidence need not be admissible, the content of the evidence must meet evidentiary requirements.  See *Goodwin v. Johnson*, 132 F.3d 162, 186 (5th Cir. 1997) (finding that the hearsay statements in an affidavit submitted to defeat summary judgment

- 14 -

were "incompetent summary judgment evidence").  That is, while an affidavit has limited admissibility at trial, it is sufficient evidence to defeat a motion for summary judgment, but inadmissible statements in the affidavit, such as hearsay statements, may not be considered by the court.  See *id.*

FED. R. EVID. 103(a)(1) requires an objecting party to make specific objections detailing the specific evidence the party wishes to have stricken and stating the specific grounds upon which each piece of evidence should be stricken.  See *United States v. Avants*, 367 F.3d 433, 445 (5th Cir. 2004).  Objections lacking specificity do not satisfy the requirements of Rule 103.  *United States v. Polasek*, 162 F.3d 878, 883 (5th Cir.1998).  "A loosely formulated and imprecise objection will not preserve error.  Rather, a trial court judge must be fully apprised of the grounds of an objection." *Id.* (citations omitted).

Ameripath's objection in its motion to strike does not meet the specificity requirement of Rule 103(a)(1).  Though Ameripath makes a vague objection to Petty's declaration on the ground that it is based on hearsay, the defendant fails to identify the portion of the affidavit it seeks to have excluded under such an objection. To the extent that Ameripath moves for the court to exclude the affidavit based on the conduct of the plaintiff's counsel, the court declines to issue such a sanction. Accordingly, the motion is denied, and the court will consider Petty's declaration to the extent that it is relevant.

- 15 -

## B.  Motion for Summary Judgment

Summary judgment is proper when the pleadings and evidence before the court show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); see also *Celotex*, 477 U.S. at 323.  The disposition of a case through summary judgment "reinforces the purpose of the Rules, to achieve the just, speedy, and inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive."  *Fontenot v. Upjohn Company*, 780 F.2d 1190, 1197 (5th Cir. 1986).

While all of the evidence must be viewed in a light most favorable to the nonmovant, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 158-59 (1970)), neither conclusory allegations nor unsubstantiated assertions will satisfy the nonmovant's summary judgment burden.  *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002) (citing *Little v. Liquid Air Corporation*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  The movant makes such a showing by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues.  *Celotex*, 477 U.S. at 323.  The pleadings, depositions, admissions, and

affidavits, if any, must demonstrate that no genuine issue of material fact exists.  FED.
R. CIV. P. 56(c).

    If the movant makes the required showing, the nonmovant must then direct
the court's attention to evidence in the record sufficient to establish that there is a
genuine issue of material fact for trial.  *Celotex*, 477 U.S. at 323-24.  To carry this
burden, the "opponent must do more than simply show . . . some metaphysical doubt
as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio
Corporation*, 475 U.S. 574, 586 (1986).  Instead, the nonmovant must show that the
evidence is sufficient to support a resolution of the factual issue in her favor.
*Anderson*, 477 U.S. at 249.  When conflicting evidence is presented, the court is not
permitted to make credibility determinations regarding the evidence.  See *Lindsey v.
Prive Corporation*, 987 F.2d 324, 327 (5th Cir. 1993).  The nonmovant cannot survive
a motion for summary judgment, however, by merely resting on the allegations in her
pleadings.  *Isquith for and on behalf of Isquith v. Middle South Utilities, Inc.*, 847 F.2d
186, 199 (5th Cir.), *cert. denied*, 488 U.S. 926 (1988); see also *Celotex*, 477 U.S. at
324.

    C.  Motion for Summary Judgment in Title VII Gender Discrimination Case

    There are two broad types of Title VII cases -- those based on direct evidence,
see *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 (1985), and those based on
circumstantial evidence, see *McDonnell Douglas Corporation v. Green*, 411 U.S. 792

(1973).  Differing standards accompany these two expansive categories.  Under the *Trans World Airlines* line of cases, when a plaintiff is able to offer direct evidence in support of a Title VII claim, the defendant must produce evidence to show that the adverse employment decision would have occurred even in the absence of the unlawful purpose.  See *Fierros v. Texas Department of Health*, 274 F.3d 187, 192 (5th Cir. 2001).  Direct evidence in the context of Title VII includes "any statement or written document showing a discriminatory motive on its face."  See *id.* at 195 (quoting *Portis v. First National Bank*, 34 F.3d 325, 329 (5th Cir. 1994)).  Direct evidence is "evidence which, if believed, proves the fact without inference or presumption."  *Davis v. Moore Wallace, Inc.*, No. 06-40544, 2007 WL 461712, at *1 (5th Cir. Feb. 7, 2007) (quoting *Brown v. East Mississippi Electric Power Association*, 989 F.2d 858, 861 (5th Cir. 1993)).  When confronting a motion for summary judgment in a case involving direct evidence, the plaintiff -- to survive summary judgment -- need only show that discriminatory intent motivated or was a substantial factor in the adverse employment decision.  See *Fierros*, 274 F.3d at 195.

Not all comments made in the workplace are sufficient to provide evidence of discrimination.  See *Krystek v. University of Southern Mississippi*, 164 F.3d 251, 256 (5th Cir. 1999).  For a comment to constitute evidence of discrimination, the comment must be "1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the terminations; 3) made by an individual

with authority over the employment decision at issue; and 4) related to the employment decision at issue." *Id.* (quoting *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996) (alteration in original)); see also *Wallace v. Methodist Hospital System*, 271 F.3d 212, 222 (5th Cir. 2001), *cert. denied*, 535 U.S. 1078 (2002).

In the case at bar, the plaintiff presents only one piece of evidence that she contends to be direct evidence of discrimination -- the affidavit of Petty. *See* Plaintiff's Brief at 34-35. In her affidavit, Petty states that "[i]n a private conversation between [her] and Dr. Hebert and in a joking manner, Dr. Steve Hebert told [her] that Dr. Brockie has the reputation of being a 'streetwalker' and that the story at Ameripath was that Dr. Brockie had financed her education by being a 'streetwalker.'" Petty Declaration ¶ 2. Brockie avers that this isolated comment is direct evidence of discrimination and that she need not meet the *McDonnell Douglas* burden shifting analysis.

Despite the Fifth Circuit's repeated articulation of the *Krystek* four-part test, Brockie proffers a variation of this standard in her attempt to categorize Hebert's statement as direct evidence. She proposes that the relevant inquiry is whether the comment is "(1) related to the discrimination, (2) contextually relevant, (3) made by someone with authority and (4) be [sic] related to the plaintiff's job prospects." Plaintiff's Brief at 35 (citing *Vance v. Union Planters Corporation*, 209 F.3d 438, 442 (5th Cir. 2000) (accurately citing the four-part standard from *Krystek*), *cert. denied*,

537 U.S. 815 (2002)).  Brockie claims that under her version of the four-part test she "clearly meets all four (4) components."  Plaintiff's Brief at 35.  However, when the actual *Krystek* four-part test is applied, it is apparent that Brockie has failed to present sufficient evidence for this stray comment to constitute direct evidence of discrimination.

While the facts in evidence indicate that Brockie has satisfied the third element (Hebert was in a position of authority over the employment decision at issue), Brockie advances no evidence in support of the other three elements.  First, it is not clear on the face of the statement that Hebert's alleged "streetwalker" comment was related to the protected class of which Brockie is a member.  Even if it is assumed that the comment meets the first element of the four-part test, however, Brockie has furnished no information as to the proximity in time between Hebert's utterance and the employment decision and she has provided no argument that the comment was related to Hebert's decision to fire Brockie.

The court concludes that the statement by Hebert, albeit crude and probably offensive, does not rise to the level of direct evidence contemplated by the case law.  To say that the "streetwalker" comment, spoken in jest or otherwise, "proves the fact without inference or presumption" that Ameripath fired Brockie on the basis of her gender is erroneous.  Compare *id.* ("Dr. Brockie has the reputation of being a streetwalker") with *Vance*, 209 F.3d at 442 (finding the statement by the employer

that he wanted a "mature man" for the position to be gender related).  Thus, Brockie must rely on circumstantial evidence to prove her claim.

When a plaintiff attempts to prove a violation of Title VII using circumstantial evidence, the *McDonnell Douglas* burden shifting analysis applies.  *See* 411 U.S. at 802.  The initial burden resides with the plaintiff, who must establish the *prima facie* elements of her claim.  See *Okoye v. University of Texas Houston Health Science Center*, 245 F.3d 507, 512-13 (5th Cir. 2001); *Ackel v. National Communications, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003).  If the plaintiff demonstrates the initial *prima facie* elements, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its adverse employment decision.  See *McDonnell Douglas*, 411 U.S. at 802.  If the defendant is able to state such a proper reason, the burden shifts back to the plaintiff to demonstrate that the reason proffered by the defendant is mere pretext.  See *Okoye*, 245 F.3d at 512; *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002).

### 1.  *The plaintiff's* prima facie *showing*

To make a *prima facie* showing of discrimination under Title VII, a plaintiff generally must establish (1) that she belongs to a protected class; (2) that she is qualified for the position; (3) that she suffered an adverse employment action; and (4) either (i) that she was replaced by someone outside of her protected class or (ii) that others outside her protected class were treated "more favorably" than she.

*Bryan v. McKinsey* & *Company, Inc.*, 375 F.3d 358, 360 (5th Cir. 2004).  Ameripath

concedes that Dr. Brockie met elements one and three -- as a female she is a member

of a protected class and the decision to terminate her employment constituted an

adverse employment action.  *See* Defendant's Brief at 13.  Elements two and four are

in dispute.

Ameripath avers that Brockie was no longer qualified for her position with the

company because certain client-physicians requested that Brockie no longer review

samples from their patients.  See *id.*  Brockie contends that this claim is false, that

none of the defendant's client-physicians requested that Brockie be prohibited from

reviewing their patients' slides.  *See* Plaintiff's Brief at 27-28.  While the defendant's

assertion that multiple physicians made such a request is in dispute, *see* Jekot

Deposition at 84 ("Q. Did you ever tell Dr. Hebert that you would not allow Dr.

Brockie to review your work?  A. No."); McGlothin Deposition at 93 ("Q. . . . Have

you ever requested that a particular pathologist not look at your work?  A. No."), it is

undisputed that this request was made by at least one client-physician, Gadol.  In

both his affidavit and his deposition, Gadol stated that he requested of Hebert that

Brockie no longer be allowed to review his patients' slides.  *See* Declaration of Steven

Gadol, M.D. ¶ 7 ("I informed Dr. Hebert that I did not want Dr. Brockie reviewing

any more of my cases"), *attached to* Defendant's Appendix *as* Exhibit B; Gadol

Deposition at 48 ("I believe -- and this is from memory -- that I told Dr. Hebert that I

did not want Dr. Brockie reviewing any more of the specimens that came through their office.  I believe I was the one that suggested that, that it was not Dr. Hebert's suggestion, but, again, that's from memory"), *attached to* Plaintiff's Appendix *as* Exhibit D.

Though the record indicates that Gadol made the request that Brockie no longer review slides for his patients, Ameripath fails to establish that his request renders her unqualified for her position.  Ameripath proffers no evidence to support its assertion that one qualification for employment is that the pathologist has the permission to work on cases from all of Ameripath's clients.  In the employment agreement between Ameripath and Brockie, section four, titled "Qualifications and Licensure," places no such qualification on her employment.  *See* Employment Agreement at 64.  While Gadol's request may serve as a legitimate, non-discriminatory reason for Brockie's termination, on the evidence before the court, Gadol's request did not render Brockie unqualified for the position.

The more difficult issue at this *prima facie* step of the analysis concerns the fourth element:  (i) was Brockie replaced by someone outside the protected class or (ii) were others outside the protected class treated more favorably?  *Bryan*, 375 F.3d at 360.  It is undisputed that Brockie was replaced by a physician who is within the same protected class as Brockie.  *See* Defendant's Brief at 13; Plaintiff's Brief at 27.  Thus, to establish a *prima facie* case of discrimination, Brockie must demonstrate that

others outside her protected class were treated more favorably.  Brockie essentially raises two arguments on this point:  (1) she avers that other male pathologists who have been sued for medical malpractice, who have misdiagnosed a patient, and/or who have committed an error similar to the one she allegedly committed have not been fired and (2) she claims that the investigation into the termination of one male pathologist was more thorough than the investigation into her termination.

A plaintiff can satisfy the fourth element of the *prima facie* step by demonstrating that she was treated differently than "similarly situated" persons who are outside her protected class and who received more favorable treatment under "nearly identical" circumstances.  *Okoye*, 245 F.3d at 514.  For a comparator to be "similarly situated," the plaintiff must demonstrate that the alleged comparator is "similarly situated with respect to their job titles, job duties, responsibilities, qualifications and experience."  *Stover v. Hattiesburg Public School District*, No. 2:05CV288KS-MTP, 2007 WL 465664, at *9 (S.D. Miss. Feb. 8, 2007).  To have "nearly identical circumstances" to those of the plaintiff, the comparators "must be those employees who had the same supervisor and who committed the same infractions or violations of company policy".  *Vargas v. Texas A&M University*, H-05-02797, 2007 WL 150484, at *4 (S.D. Tex. Jan. 16, 2007).  "In short, to raise a presumption of discrimination, plaintiff must demonstrate that a [male] employee, who engaged in the same misconduct under similar circumstances, was not

terminated." *Id.* While the Fifth Circuit has appeared hesitant to apply the "nearly identical" standard at the *prima facie* step of the analysis, see *Coleman v. Exxon Chemical Corporation*, 162 F. Supp. 2d 593, 608 (S.D. Tex. 2001) (citing examples), when a plaintiff relies on the claim of disparate treatment to meet her burden at the pretext step, the "nearly identical" standard is applied stringently. See *Hockman v. Westward Communications, L.L.C.*, 282 F. Supp. 2d 512, 527-28 (E.D. Tex. 2003), *aff'd*, 407 F.3d 317 (5th Cir. 2004); *Coleman*, 162 F. Supp. 2d at 608.[5] Because there is some question whether the "nearly identical" standard should be applied stringently at the *prima facie* step, the court will address whether Ameripath has articulated a legitimate non-discriminatory reason for Brockie's termination before determining whether she has proffered sufficient comparators to survive summary judgment.[6]

### 2. *The defendant's burden to articulate a legitimate, non-discriminatory reason for termination*

If it is assumed for the moment that Brockie has established a *prima facie* case of discrimination, the burden then shifts to Ameripath to articulate a legitimate non-

---

[5]     To be clear, the court notes that the Fifth Circuit has held the "nearly identical" standard to be applicable at the *prima facie* step of the *McDonnell Douglas* burden shifting analysis. See *Bennett v. Total Minatome Corporation*, 138 F.3d 1053, 1062 (5th Cir. 1998).

[6]     It would be a hollow victory for the plaintiff and a waste of resources for the court to determine that the plaintiff's alleged comparators were similarly situated and nearly identical for purposes of the *prima facie* step only to then determine that they are not similarly situated and nearly identical to survive the pretext step, especially in light of the court's conclusion that the defendant articulated a legitimate, non-discriminatory reason for terminating Brockie. See *infra* § II.C.2.

discriminatory reason for the adverse employment action.  *Okoye*, 245 F.3d at 512.

"This burden is one of production, not persuasion; it 'can involve no credibility

assessment.'"  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000).

Brockie, relying on *Patrick v. Ridge*, 394 F.3d 311 (5th Cir. 2004), argues that

Ameripath failed to articulate a reason with sufficient clarity to meet this second step

of the *McDonnell Douglas* burden shifting analysis.  Plaintiff's Brief at 29.

    The employer, when offering its legitimate, non-discriminatory reason for

taking an adverse employment action, must state such reason with sufficient clarity

"to afford the employee a realistic opportunity to show that the reason is pretextual."

*Patrick*, 394 F.3d at 317.  "[A] defendant employer must articulate in some detail a

more specific reason than its own vague and conclusional feeling about the

employee."  *Id.*  In *Patrick*, the Fifth Circuit found that the employer's stated reason

for its adverse employment action -- that the plaintiff was not "sufficiently suited" for

the position -- failed to satisfy the employer's burden of production at the second step

of the *McDonnell Douglas* analysis.  *Id.*  In reaching its decision, the Fifth Circuit

quoted at length an opinion from the Eleventh Circuit:

> [I]t might not be sufficient for a defendant employer to say
> it did not hire the plaintiff applicant simply because "I did
> not like his appearance" with no further explanation.
> However, if the defendant employer said, "I did not like his
> appearance because his hair was uncombed and he had
> dandruff all over his shoulders," or "because he had his
> nose pierced," or "because his fingernails were dirty," or
> "because he came to the interview wearing short pants and

> a T-shirt," the defendant would have articulated a "clear
> and reasonably specific" basis for its subjective opinion --
> the applicant's bad (in the employer's view) appearance.

*Id.* (quoting *Chapman v. AI Transportation*, 229 F.3d 1012, 1034 (11th Cir. 2000) (en

banc)).  The *Patrick* court went on to state that if the defendant-employer had

verbalized reasons for why the plaintiff was not "sufficiently suited" for the position,

then the defendant's reason might have been sufficient to meet its burden of

production.  *Id.*

Patrick's holding notwithstanding, the court concludes that the legitimate, non-

discriminatory reason articulated by Ameripath meets the burden of production

incumbent on the defendant in the same manner as explained by the Eleventh Circuit

in *Chapman*.  Brockie is correct that Hebert's stated reason for discharging Brockie

was, in part, that he lost confidence in her.  *See* Hebert Deposition 8.  Without more,

this statement might be insufficient to satisfy *Patrick's* clarity requirement, but

Hebert's assertion is supported by reasons for his lack of confidence in Brockie.

Hebert went through several examples of instances that led to his loss of confidence

in Brockie's abilities.  Specifically, he referenced the two cases involving patients of

Gadol and the one incident involving the misdiagnosis of McGlothin's patient.[7]  *See*

Hebert Deposition at 10-15, 25-26.  Additionally, it is undisputed that both

Stoddard and Jekot communicated negative assessments of Brockie's performance to

---

[7]    Though Hebert cites other examples, these three instances represent the
only examples for which there is no factual dispute.

Hebert. *Id.* at 20-22; Stoddard Declaration ¶ 8. When coupled with both the specific uncontested examples of misdiagnoses and the assessments by these physicians, Hebert's statement that he lost confidence in Brockie constitutes more than his "vague and conclusional feeling" about the plaintiff.[8]

Thus, Ameripath has met its burden of production by stating with sufficient clarity a legitimate, non-discriminatory reason for its decision to terminate Brockie.

### 3.   *The plaintiff's burden to demonstrate pretext*

Because Ameripath has articulated a legitimate, non-discriminatory reason for terminating Brockie, to survive summary judgment, she must come forward with evidence demonstrating that the stated reason is merely pretext for discrimination. See *Okoye*, 245 F.3d at 513. Brockie attempts to establish pretext in three ways, by demonstrating (1) that similarly situated male pathologists were treated more favorably by the defendant under nearly identical circumstances; (2) that Ameripath has a history of discrimination; and (3) that the procedure used in terminating her employment violated Ameripath's own policy for investigation of physician matters.

### 4.   *Treatment of similarly situated male comparators under nearly identical circumstances*

Brockie argues that she was terminated while Ameripath retained other male pathologists who committed more significant misdiagnoses. She offers to the court a

---

[8]      Furthermore, Hebert also stated that he fired Brockie because of her unprofessional behavior, several instances of which remain undisputed. See *supra* § I.

list of male pathologists who she claims to be sufficiently similar comparators:

Hebert, Aldred, James, a Dr. Barns, and a Dr. Soloman.  *See* Plaintiff's Brief at 37.

Brockie lists the above-mentioned male pathologists as employees who during their

careers made one misdiagnosis but were retained by Ameripath.  She argues that the

misdiagnoses by at least some of these physicians were more significant than her

rectal cancer misdiagnosis because some of the male misdiagnoses led either to

lawsuits being filed or to Ameripath entering into settlements with the patient.

According to Brockie, because her misdiagnosis, to her knowledge, did not result in a

lawsuit or settlement, her misdiagnosis was less serious than these others.

While vigorously attempting to establish these male pathologists as her

comparators, Brockie, with equal fervor, attempts to distinguish herself from another

male pathologist formerly employed by Ameripath -- Dr. Faruk Aydin ("Aydin").  *See*

Plaintiff's Brief at 21-22.  According to Brockie, Aydin's employment with Ameripath

was terminated after "multiple and consistent performance issues."  *Id.*  Relying on

the testimony of Aldred, Brockie contends that Aydin committed multiple

misdiagnoses and was fired only after a "last straw" misdiagnosis in which he

erroneously found breast cancer in a sample of healthy breast tissue.  *Id.* at 22.  In

addition to this "last straw" misdiagnosis, Brockie highlights one other misdiagnosis

by Aydin in which he made an erroneous finding of prostate cancer which led to the

unnecessary removal of a patient's prostate.  *Id.*  Also, in an effort to distinguish

Aydin's situation from her own, Brockie notes that one corporate client of Ameripath, a surgery center, discontinued using Ameripath's services due to Aydin's mistakes and that Ameripath did not allow Aydin to work on certain physicians' cases.  *Id.*

Brockie fails both to demonstrate that these male employees were similarly situated and to evince that the male employees were treated more favorably under nearly identical circumstances.[9]  Again, to be similarly situated to the proffered comparator, the plaintiff must have the same job title, job duties, responsibilities, qualifications, and experience.  See *Stover*, 2007 WL 465664, at *9.  Brockie presents absolutely no evidence to the court regarding the qualifications or experience of these alleged comparators.  Furthermore, at least two of her purported comparators -- Hebert and Aldred -- are not similarly situated because they both have different job

---

[9]        Brockie not only fails to make the requisite showing that these male comparators were similarly situated and treated more favorably under nearly identical circumstances, but her logic is also flawed.  Variations in the severity of the violation committed may warrant differing levels of punishment.  See *Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) (holding that the termination of one food service employee who stole bat mitzvah gifts while retaining another employee who stole alcohol and party decorations was not competent comparator evidence because the thefts were of different severity), *cert. denied*, ___ U.S. ___, 126 S. Ct. 1027 (2006).  Brockie provides no evidence that her misdiagnoses were equally severe or less severe that the misdiagnoses of her proffered comparators.  Brockie's contention that the filing of a lawsuit or the entering into a settlement constitutes a more serious misdiagnosis is an unsupported logical fallacy.  As an example, while Aldred admits to having been sued three times in connection to his role as a pathologist, two of the suits resulted in dismissal and one resulted in summary judgment in his favor.  Deposition of Dr. Stephen Aldred at 3-4, *attached to* Plaintiff's Appendix *as* Exhibit A.  How having these suits filed against him makes Aldred's conduct more egregious than Brockie's is beyond the court's understanding.

titles and different job responsibilities from Brockie.  Moreover, Brockie's attempt to classify Hebert as a comparator is wholly unpersuasive because his alleged misdiagnosis predates his employment with Ameripath.

Even if these male pathologists were similarly situated, the more favorable treatment must have occurred under nearly identical circumstances.  For the circumstances to be nearly identical, the comparators must have committed the same violations and must have been subject to the same supervisor.  *Vargas*, 2007 WL 150484, at *4.  Brockie has not shown that she committed the same violation as that of these alleged comparators.  First, Brockie attributes to each of her proffered comparators a single misdiagnosis.  Yet she ignores that the uncontroverted evidence before the court that she committed at least two misdiagnoses -- the misdiagnosis of McGlothin's breast cancer patient and the misdiagnosis of Gadol's rectal cancer patient.  Additionally, she fails to assert whether these comparators were subject to the same negative performance assessment that was conveyed to Hebert, and she does not offer evidence that these comparators were engaged in the same types of unprofessional conduct as she was.  Finally, Brockie provides no evidence as to the identity of the male comparators' supervisors, with the exception of Aydin, who -- like Brockie -- reported to Hebert.

Of the other Ameripath employees discussed by Brockie, it appears that the circumstances surrounding Aydin's termination may be the most closely identical to

- 31 -

the circumstances leading to Brockie's termination.[10]  Aydin, like Brockie, made

multiple misdiagnoses.  Brockie misdiagnosed a breast cancer patient as having cancer

when the patient did not have cancer; Aydin misdiagnosed a patient as not having

breast cancer who indeed had breast cancer.  Brockie misdiagnosed a patient as

having rectal cancer that resulted in the removal of the patient's rectum; Aydin

misdiagnosed a patient as having prostate cancer that resulted in the removal of the

patient's prostate.  Brockie was not allowed to work on a certain physician's cases;

Aydin was not allowed to work on certain physicians' cases.[11]

In the alternative, Brockie contends that even if Aydin were the best

comparator to her, Ameripath's disparate treatment of her in its investigation leading

up to her termination can serve to demonstrate discrimination on the part of

Ameripath.  Her entire argument along this line is as follows:

> Dr. Hebert terminated Dr. Aydin without first placing him
> on administrative leave. . . .  Dr. Aydin's separation from
> the company was also handled differently by Human
> Resources.  Ameripath provided Dr. Aydin a real (not
> sham, after-the-fact, investigation) [sic].  Dr. Aydin's

---

[10]     To be clear, the court does not find that Aydin *is* a sufficient comparator
to Brockie, only that by virtue of the information before the court, his termination
seems to most closely resemble Brockie's termination.

[11]     The only differences between Brockie and Aydin observed by the court
are that (1) the testimony indicates that Aydin had three misdiagnoses while Brockie
had only two uncontested misdiagnoses (not counting Gadol's microscopic colitis
patient); (2) one of Aydin's misdiagnoses resulted in the filing of a lawsuit; and
(3) one of Ameripath's corporate clients terminated its use of Ameripath's services as
a result of Aydin's performance.  *See* Plaintiff's Brief at 21-22.

termination involved documentation of the errors he
made.  . . .  The investigation of Dr. Aydin took several
weeks.

Plaintiff's Brief at 22 (internal citations omitted).  While Brockie is correct that the

evidence before the court indicates that there were *differences* between the

investigation into Brockie's conduct and the investigation into Aydin's conduct, she

has not demonstrated how these differences resulted in *more favorable treatment* for her

male counterpart.  Brockie's entire argument focuses solely on superficial differences

between the two investigations but fails to point to any information tending to show

that Aydin was treated more favorably.  That is, Brockie provides no information

regarding substantive or procedural differences that were more favorable to Aydin.

Perhaps more importantly, Brockie provides no argument as to what benefits she

would have received if Ameripath had provided parity in the two investigations.

There is insufficient evidence before the court to make the determination that

any of Brockie's proffered male comparators were similarly situated to Brockie and

treated more favorably.  Moreover, Brockie has failed to create a genuine issue as to

any material fact that would warrant a finding that any of these comparators were

treated more favorably under nearly identical circumstances.  Accordingly, the court

concludes that Brockie has failed to establish the fourth element of the *prima facie*

case.  Alternatively, to the extent that the "nearly identical" standard should be

treated more leniently at the *prima facie* step and that Brockie's showing was sufficient

to meet the more lenient standard, her evidence still fails to demonstrate pretext.  In

light of the debate regarding the applicability of the "nearly identical" standard at the

*prima facie* step, the court will, for the sake of completeness, address the other two

arguments offered by Brockie to show pretext.

### 5.  *Ameripath's history of discrimination*

Brockie attempts to establish pretext by arguing that Ameripath has a history

of discrimination and that this history of discrimination is sufficient to permit an

inference of pretext.  *See* Plaintiff's Brief at 23-24, 39-40.  As the sole basis for her

allegation that Ameripath has a history or practice of discrimination, Brockie cites the

affidavit of Petty.  The incidents described by Petty in her affidavit are sporadic in

nature.  *See* Petty Declaration ¶¶ 4-5.  Petty highlights the following instances:  (1) a

claim of sexual harassment by a male physician-employee against a female physician-

employee; (2) a statement by a second male physician-employee indicating that he

believed he was sexually harassed by the same female physician-employee and that he

believed he was a victim of discrimination based on his sexual orientation; (3) a

statement by a female physician-employee indicating that she believed she was a

victim of gender discrimination and sexual orientation discrimination; (4) a statement

by a female physician-employee indicating that she believed she was a victim of

discrimination based on her national origin; (5) a statement by a female employee

based in Florida indicating that she "felt racial discrimination" by Fuller; (6) a

statement by a female employee that she "felt racial discrimination" by a female

employee; (7) a statement by a female employee indicating that she "felt age

discrimination" and that she was subjected to a hostile work environment by another

female employee; and (8) statements from "various individual[s]" indicating that they

felt they were victims of racial discrimination.  *Id.*  To be sure, the declaration of

Petty notes only one instance of a statement by a female employee regarding gender-

based discrimination.  *Id.* ¶ 4.  There is no information regarding the Ameripath

facility at which this female physician-employee was employed, and there is no

information as to who was responsible for the alleged discrimination.  Furthermore,

there is no indication that Hebert, the decision maker in the Brockie case, was

involved in any of the claims or statements of discrimination.

In making her legal argument that a history of discrimination can be used to

establish pretext, Brockie cites only two cases:  *Vance*, 209 F.3d 438, and *Shattuck v.*

*Kinetic Concepts, Inc.*, 49 F.3d 1106 (5th Cir. 1995).  Plaintiff's Brief at 39-40.  In

*Vance*, the Fifth Circuit affirmed the district court's decision to allow evidence

regarding prior discrimination on the part of the employer.  209 F.3d at 445.  The

*Vance* plaintiff, a woman, applied for a position at the defendant's bank; she filed a

claim gender discrimination under Title VII following the defendant's decision not to

hire her.  See *id.* at 439-40.  Prior to trial, the defendant filed a motion *in limine*

seeking to exclude evidence of a previous adjudication in which the defendant was

found to have discriminated against a woman based on her gender.  *Id.* at 440-41.

The court permitted the plaintiff to "ask [the decision maker] if he had ever been

found to have discriminated against women in this work place"; when presented with

the question, the decision maker answered in the affirmative.  *Id.*  The Fifth Circuit

held that "evidence that [the defendant] had been found to have discriminated

against women in the past could help" to establish pretext.  *Id.* at 445.

Direct evidence of age discrimination by the defendant against a previous

employee can be used to establish pretext for a plaintiff *within the same protected* class

as that previous employee.  *Shattuck*, 49 F.3d at 1109-10.  Following termination by

his employer, the plaintiff in *Shattuck* filed suit alleging age discrimination.  See *id.* at

1108.  At trial, a former member of the employer's human resources staff testified

that the decision maker previously stated that a certain applicant was "too old" for a

position.  *Id.* at 1109.  The Fifth Circuit affirmed the trial court's decision to allow

this testimony and found "[t]here is no proscription of evidence of discrimination

*against other members of the plaintiff's protected class*; to the contrary, such evidence may

be highly probative, depending on the circumstances."  *Id.* at 1109-10 (emphasis

added).  The court further stated, "To the extent that [the employer] complains of

testimony about race or gender bias, such testimony was assiduously excluded by the

district court and the isolated instances in which references were made did not taint

the verdict."  *Id.* at 1109.

Under the express language of the cases relied on by Brockie, the evidence regarding past discrimination included in Petty's declaration is insufficient to establish pretext.  First, of the eight incidents described by Petty, only five involved female complainants; accordingly, under *Shattuck's* rationale, the other four incidents are not probative of pretext.  Second, of the five statements made to Petty by female employees of Ameripath, only one claim was related to gender discrimination; thus, the other four statements made by females are not probative of a pretext for gender discrimination.  The only remaining potion of Petty's declaration upon which Brockie can rely is the sentence that Petty "learned that Dr. Jana Sullinger believed Ameripath discriminated against her on the basis of gender and sexual orientation by failing to promote her and compensate her as promised."  Petty Declaration ¶ 4.  However, this lone statement is not evidence of a history of gender discrimination on the part of Ameripath.  This potentially hearsay statement merely serves as evidence of the fact that Dr. Jana Sullinger believed she was discriminated against.  It is neither direct evidence, as was the case in *Shattuck*, nor an adjudication of discrimination, as was the case in *Vance*.

This sole assertion by Petty falls well below the standard for evidence of pretext, as previously held by this court.  In *Dorsey v. United Parcel Service*, No. 3:03-CV-0920-P, 2004 WL 345488 (N.D. Tex. 2004) (Solis, J.), the court found that the plaintiff failed to produce evidence of pretext sufficient to survive summary judgment

where the plaintiff presented evidence that fourteen lawsuits alleging racial discrimination had been filed against the employer.  2004 WL 345488, at *8.  The court held that the fact that these suits had been filed without evidence of the outcomes or judgments in those cases was insufficient to establish a claim of discrimination.  *Id.*  Furthermore, the court noted that the plaintiff failed to cite a single authority in favor of his argument that a history of discrimination alone is sufficient to establish pretext.  *Id.*  "Plaintiff's argument is absolutely without merit, and has no relevance whatsoever to his ultimate burden to demonstrate that [his employer]'s stated reason for his termination was in fact a pretext for discrimination."  *Id.*

This court is in agreement with *Dorsey*:  the filing of a lawsuit, without more, is not evidence of a history of discrimination.  Brockie's single statement that a female employee told Petty that she believed she was discriminated against on the basis of gender falls woefully short of even the *Dorsey* plaintiff's evidence.  Petty's statement provides no probative value to establish a history of discrimination and serves as no evidence for the plaintiff's argument that Ameripath's legitimate, non-discriminatory reason for her termination was pretextual.

### 6. *Ameripath's failure to follow its policy regarding termination*

Brockie's third and final attempt to meet her burden of demonstrating pretext is her argument that Ameripath deviated from its standard procedure in terminating

her employment.  Again, Brockie relies on a single piece of evidence -- Petty's declaration.  *See* Plaintiff's Brief at 11, 39.  In her declaration, Petty stated, "During [her] tenure at Ameripath . . . Steve Fuller was responsible for all investigations regarding administrative leave and/or termination for physicians."  Petty Declaration ¶ 3.  This one sentence constitutes the entirety of what Brockie claims to be Ameripath's policy regarding placing a physician on administrative leave or terminating a physician.  Based entirely on this single statement by Petty, Brockie cites the following facts as evidence of Ameripath's failure to comply with its own policy:  (1) Fuller did not come to Dallas to investigate the reasons for Brockie's termination; (2) Fuller did not talk to the complaining physicians; and (3) Fuller did not return phone calls placed by Petty to him during the time period between Brockie being placed on administrative leave and her termination.  *See* Plaintiff's Brief at 11, 39.

Assuming, without deciding, that Brockie's legal proposition is correct -- *i.e.*, that an employer's failure to follow its own internal policies or procedures can constitute evidence of pretext -- the court concludes she has failed to present any evidence of a failure on Ameripath's part to comply with its own policies and procedures.  To be sure, Petty's statement provides only one limited piece of evidence relevant to Brockie's termination: when an investigation is conducted into the termination of a physician, Fuller is vested with the responsibility of that task.  What

is notably absent from her statement is whether, under the policies and procedures of Ameripath, Brockie was entitled to an investigation prior to her termination without cause. The only evidence before the court regarding whether Brockie was entitled to an investigation prior to termination comes from the deposition testimony of Fuller. He stated that his permission was not needed to place an employee on administrative leave and that the proper procedure for placing an employee on administrative leave was merely for the supervisor to inform the employee. *See* Deposition of Stephen Fuller ("Fuller Deposition") at 200, Dec. 19, 2006, *attached to* Plaintiff's Appendix *as* Exhibit T. He further stated that the decision to terminate an employee rests with the managing director of the individual lab and that in this case, the decision to terminate Brockie rested with Hebert. *Id.* at 201. While Fuller testified that he "encouraged" Hebert to obtain documentation from other sources regarding the complaints Hebert received about Brockie's performance, there is no evidence before the court that anything other than Hebert's judgment was necessary to terminate Brockie's employment.

Had Brockie come forward with evidence indicating that Ameripath had a policy requiring an investigation prior to termination under the "without cause" provision of her contract, this final argument to prove pretext might have been persuasive. However, she failed to submit any evidence of such a policy.

Before the court is undisputed evidence that Ameripath both possessed and articulated a legitimate, non-discriminatory reason for terminating Brockie's employment.  Because she has failed to provide a similarly situated comparator who was outside her protected class and who was treated more favorably under nearly identical circumstances, she has not established a *prima facie* case.  Additionally, even if her comparator evidence was sufficient to establish a *prima facie* claim of discrimination, her comparator evidence is insufficient to constitute any evidence at the pretext step under the stringent "nearly identical" standard.  Similarly, Brockie is without evidence to support her argument that Ameripath has a history of gender discrimination or that Ameripath violated its policies in terminating her employment. Thus, Brockie has been unable to carry her summary judgment burden.

### III.  CONCLUSION

For the reasons stated above, the defendant's motion to strike is **DENIED**, but the defendant's motion for summary judgment is **GRANTED**.  Judgment will be entered that Brockie take nothing from Ameripath on her claims in this case.

**SO ORDERED**.

April 23, 2007.

_____

A. JOE FISH

CHIEF JUDGE

- 41 -